IN THE SUPREME COURT OF NORTH CAROLINA

No. 336A19

Filed 17 July 2020

IN THE MATTER OF: J.C.L.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 7 May 2019 by Judge Emily G. Cowan in District Court, Henderson County. This matter was calendared for argument in the Supreme Court on 19 June 2020 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Susan F. Davis, Assistant County Attorney, for petitioner-appellee Henderson County Department of Social Services.*
>
> *Michelle FormyDuval Lynch, GAL Appellate Counsel, for appellee Guardian ad Litem.*
>
> *Anné C. Wright for respondent-appellant father.*

MORGAN, Justice.

Respondent father appeals from an order terminating his parental rights to his minor child, J.C.L. (Josiah).[1] We affirm the trial court's determination.

The Henderson County Department of Social Services (DSS) filed a petition on 6 December 2016, alleging that Josiah was a neglected juvenile in that (1) respondent

---

[1] The minor child will be referenced throughout this opinion as "Josiah," which is a pseudonym used to protect the child's identity and for ease of reading.

and Josiah's mother had used marijuana in front of Josiah and Josiah's half-sibling; (2) respondent and the mother had committed the offense of shoplifting in the presence of the children; (3) respondent had engaged in acts of domestic violence against the children's grandmother in their presence; and (4) the family did not have stable housing. DSS filed a supplemental petition on 27 February 2017, adding allegations that (1) respondent and the mother had taken Josiah and Josiah's half-sibling to Greenville, South Carolina, to avoid juvenile court proceedings; (2) respondent had used inappropriate discipline upon Josiah's half-sibling; (3) respondent and the mother had not enrolled the children in school; (4) the mother had failed to appropriately supervise the children while living at a temporary shelter; (5) respondent and the mother were seen screaming at and hitting each other in the temporary shelter's parking lot; and (6) the mother had tested positive for marijuana. DSS had initially left custody of Josiah with respondent and the mother but obtained nonsecure custody of him by order entered 27 February 2017.

After a hearing on 1 June 2017, the trial court entered an order adjudicating Josiah to be a neglected juvenile. In its separate disposition order, the trial court continued custody of Josiah with DSS and granted weekly supervised visitation to respondent. The trial court ordered respondent to (1) submit to random drug and alcohol screenings as requested by DSS; (2) refrain from further criminal activity, including illegal drug use, in Josiah's presence; (3) participate in family-centered therapy and comply with all referrals and recommendations; (4) address his anger

management issues in therapy; (5) demonstrate stable income sufficient to meet the family's needs; (6) obtain and maintain an appropriate residence for the family; (7) maintain contact and cooperate with DSS; (8) participate in a formal budgeting counseling program and implement a monthly budget; (9) complete parenting classes and demonstrate age-appropriate parenting skills; (10) complete individual and/or family therapy if recommended by his mental health assessment; and (11) pay child support.

By order entered 1 November 2017, the trial court established the primary permanent plan for Josiah as reunification with respondent and the mother and set the secondary permanent plan as adoption. The trial court continued with these plans until 10 September 2018, when it entered an order finding that both respondent and the mother had not made adequate progress under their plans, had not actively participated in their plans, had not cooperated with DSS, and had not cooperated with the guardian *ad litem*. The trial court changed Josiah's primary permanent plan to adoption and his secondary permanent plan to guardianship.

DSS filed a petition to terminate the parental rights of both parents to Josiah on 1 October 2018. As grounds for termination, DSS alleged the grounds of neglect and failure to make reasonable progress to correct the conditions that led to Josiah's removal from the home. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019). DSS filed an amended petition on 18 January 2019, adding additional factual allegations to support its alleged grounds. After a hearing which began on 7 March 2019 and ended

on 4 April 2019, the trial court entered an order on 7 May 2019 terminating both respondent and the mother's parental rights to Josiah. The trial court concluded that both grounds existed to terminate parental rights as alleged by DSS and that termination of parental rights, including the parental rights of respondent as Josiah's father, was in Josiah's best interests.[2] Respondent appeals.

We review a trial court's adjudication of the existence of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). "Unchallenged findings of fact made at the adjudicatory stage are binding on appeal." *In re Z.V.A.*, 373 N.C. 207, 211, 835 S.E.2d 425, 429 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). Additionally, "[a] trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019) (citing *In re Moore*, 306 N.C. 394, 403−04, 293 S.E.2d 127, 132 (1982)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

*Adjudicatory Findings of Fact*

---

[2] The trial court's order also terminated the parental rights of Josiah's mother, but she is not a party to this appeal.

We first address respondent's challenges to several of the trial court's findings of fact. Respondent first challenges Finding of Fact 52 which states:

> 52. The parents have been late with rent several months [and] have received disconnect notices from the utility company. The parents have not been successful in connecting the gas in order for the heat in the home to function. For the past two winters they have not had heat except for one small space heater in the main living area, which did not adequately heat the home.

Respondent contends that the portion of this finding that states that respondent's home was only heated by one small space heater is unsupported by the evidence, because the social worker's testimony regarding this fact was hearsay and was contradicted by other testimony. Respondent did not raise any objection, either on a hearsay ground or upon any other basis, to the social worker's testimony at trial. He has thus waived his hearsay argument on appeal, and the social worker's testimony must be considered to be competent evidence. N.C. R. App. P. 10(a)(1); *See also, e.g., In re F.G.J.*, 200 N.C. App. 681, 693, 684 S.E.2d 745, 753–54 (2009) (holding "any objection has been waived, and the testimony must be considered competent evidence" where no objection on hearsay grounds was made by either parent at the hearing). Moreover, because the trial court's finding is supported by the social worker's testimony, it is deemed conclusive for appellate review purposes. Respondent does not challenge the remainder of Finding of Fact 52; accordingly, the entire finding of fact is binding on appeal.

Respondent next contends that Finding of Fact 40 is not supported by clear, cogent, and convincing evidence. In Findings of Fact 37 through 39, the trial court specified that respondent had received two alternative substance abuse treatment recommendations because his Medicaid insurance had been discontinued, that the social worker had told respondent that he needed to contact DSS to reinstate his insurance, that these discussions between the social worker and respondent had occurred repeatedly from 6 February to 16 April 2018, that respondent reapplied for his insurance on 17 April 2018, and that his insurance was reinstated on 18 April 2018. In Finding of Fact 40, the trial court then determined:

> 40. [Respondent] could have rectified his insurance (Medicaid) problems in early February 2018 if he had gone to Rutherford County DSS. However, it took him over two months to go to Rutherford County DSS to get his Medicaid reinstated.

Respondent contends that this finding is not supported by the evidence, because respondent testified that the required appointment could not be made for the same day and that sometimes there is a waiting period of several months to get an appointment. Respondent's testimony, however, was presented in the context of Josiah's need for therapy due to respondent's failure to complete his case plan in the preceding twenty-four months:

> Q. . . . Do you think [Josiah] would need therapy?
>
> A. Of course. After what he's been through, I'm sure. As with [Josiah's half-sibling], being bounced around everywhere.

Q. Well, wouldn't it be true, sir, that if you all had finished your case plan sooner than 24 months, they wouldn't have been bounced around?

. . . .

[A]: I don't think it's the case plan. I think it's the constant continuances in this case. It's not our fault. Things happen in life, you know. Medicaid appointments can't be made the same day. Sometimes appointments are six months away.

Nothing in respondent's testimony suggests that respondent attempted to contact DSS before 17 April 2018 to reinstate his Medicaid insurance, or that the appointments to which respondent was referring in this portion of his testimony were with DSS for the purpose of reinstating his Medicaid insurance as opposed to an attempt to schedule therapy appointments for Josiah. Consequently, we hold that the trial court's Finding of Fact 40 is supported by the social worker's testimony and thus binding on appeal.

Respondent also argues that the completion timeframe set forth in Finding of Fact 41 is not supported by the evidence. This factual finding states:

41. [Respondent] completed a basic level substance abuse course six weeks ago, however this course did not include[] group or individual counseling.

The certification of completion of the course in question displays a completion date of 19 December 2018. To the extent that this finding of fact recognizes respondent's completion date was later than 19 December 2018, we agree with respondent. On the other hand, respondent does not challenge the portion of Finding of Fact 41 that his

substance abuse course did not include group or individual counseling, and this segment of the factual finding is binding on appeal.

Respondent next challenges Finding of Fact 50:

> 50. [Respondent] struggles with recurrent anger issues, and has become inappropriately belligerent with the Social Worker, the Social Worker Supervisor and the Program Manager on multiple occasions. [Respondent's] main reaction to conflict or to things that make him angry or frustrated is to remove himself from the situation, leaving in a fit, and not dealing with whatever it is that has him upset. This at times, leads to an inability to obtain necessary information as it relates to the juvenile.

To the extent that this finding stands for the proposition that he was displaying issues with anger in the period leading up to, or at the time of, the termination hearing, respondent asserts that Finding of Fact 50 is unsupported by the evidence. The social worker's testimony, however, establishes that respondent struggled with recurrent anger issues, became belligerent with DSS employees, stormed out of rooms during meetings with DSS personnel, and generally dealt with situations that angered him by leaving the situation. Although the social worker testified that she had seen a "slight change over the last several months" with regard to respondent's anger issues, this improvement was due in part to the social worker's new discussion tactics by avoiding opposition with respondent.

Respondent also asserts that his decision to leave frustrating situations is a technique developed in conjunction with the Family Centered Treatment (FCT) clinician with whom respondent had worked in order to help respondent to deal with

his anger management issues, thereby showing that respondent was making reasonable progress toward satisfying the requirements of his case plan. However, the clinician's testimony focused only upon the manner in which respondent dealt with anger when respondent was under stress due to interactions with Josiah and did not address more generalized situations which might invoke respondent's anger. In the limited circumstances about which the social worker testified, respondent was reported to have handed Josiah to his mother while stepping away until respondent could calm down. The trial court's finding of fact at issue, in contrast, relates to respondent's general reactions when he became angry—particularly with adults involved in the case—and how respondent reacted inappropriately by leaving the situation in an enraged state. We hold that the trial court's Finding of Fact 50 regarding respondent's inability to restrain his emotions when interacting with the DSS employees who were working to ensure Josiah's care and attempting to reunify Josiah with respondent is supported by the social worker's testimony.

Next, respondent challenges Finding of Fact 28 which states:

> 28. [Respondent's 10 January 2018 Comprehensive Clinical Assessment] recommended that [respondent] engage with outpatient substance abuse therapy including group and individual counseling as well as to follow through with his physical health needs through regular care by his physician.

Respondent represents that the recommendations from the 10 January 2018 assessment referenced in Finding of Fact 28 are instead correctly stated in Finding of Fact 36:

> 36. The CCA completed by [respondent] on January 10, 2018 recommended two avenues in which to address his substance abuse issues. [Respondent] was to participate in basic level substance abuse services to address his diagnoses of Cannabis Use Disorder, Moderate[;] and Stimulant Use Disorder (Methamphetamines) Mild as well as to identify preliminary goals and corresponding stages of change and complete a relapse prevention plan; OR engage in individual therapy to address his diagnoses of Cannabis Use Disorder, Moderate[;] and Stimulant Use Disorder (Methamphetamines) Mild as well as to identify preliminary goals and corresponding stages of change and to complete a relapse prevention plan. In addition, if [respondent] is unsuccessful in abstaining from illegal substance[s] or legal substances not prescribed, he shall participate in Substance Abuse Intensive Outpatient Services.

We agree with respondent that Finding of Fact 36 accurately sets forth the recommendations of his 10 January 2018 Comprehensive Clinical Assessment. Finding of Fact 28 also includes recommendations from respondent's FCT clinician, from whose program respondent was terminated at the end of August 2018. This Court will further consider this portion of Finding of Fact 28 accordingly.

Respondent additionally submits that Finding of Fact 42 is not supported by the evidence. This finding of fact states:

> 42. [Respondent] has not completed individual and group counseling/therapy.

Respondent contends that the recommendation made by his FCT clinician at the time that respondent was terminated from the Family Centered Treatment program was that he "continue" participating in substance abuse treatment with group and individual counseling, which respondent completed in December 2018. However, the trial court found that respondent's basic level substance abuse course did not encompass group or individual counseling, and respondent has not challenged this finding. Although respondent testified that he was engaged in some individual therapy, respondent could not articulate the services that he received from the therapist apart from his statement that she provided "safe, you know, practices and, you know, solutions, recommended agencies or groups that we can take." Accordingly, we are not persuaded by respondent's challenge to Finding of Fact 42.

The Court next addresses respondent's objections to Findings of Fact 72 and 74. The findings state:

> 72. [Respondent] blames his lack of completing the court's reunification requirements on other people.
>
> . . . .
>
> 74. The juvenile has been out of the home for 769 days. The parents are not taking responsibility for why the juvenile came into custody, nor have they completed the court's reunification requirements.

Respondent claims that these findings are not supported by clear, cogent, and convincing evidence, because the FCT clinician testified that the clinician observed the parents "progressing and taking responsibility for DSS's involvement," the

October 2018 letter from the FCT clinician identified behaviors displayed by respondent of "ownership" and "less blaming," and respondent testified that respondent had learned not to blame other people. Although respondent may have shown some behaviors characterized by "ownership" and "less blaming" in sessions with the FCT clinician, at the hearing, respondent blamed the continuances allowed in the case, rather than respondent's inability to meet the requirements of his case plan, as the reason why the case had gone on for so long. Respondent further stated that the delay was not his fault. The social worker added testimony that, during the entirety of the case, respondent never accepted any responsibility for the circumstances that led to Josiah coming into DSS custody. These findings of fact numbered 72 and 74 are thus supported by record evidence.

Respondent likewise challenges Finding of Fact 60 which provides:

> 60. The juvenile has special needs. He is physically aggressive (biting, kicking, hitting). He has extreme tantrum behaviors that can last from minutes to hours especially if he is not getting his way or is being told no. He recently has begun being aggressive with animals in the foster home (throwing and hitting them with toys, pulling tails and ears and kicking) despite all attempts at redirection.

Respondent contends that there is no evidence to support the portion of this finding which recites that Josiah had kicked any animals or hit them with toys. We agree with respondent's contention and therefore disregard said portion of Finding of Fact 60. Respondent otherwise concedes that this factual finding is supported by the

evidence, but offers that Josiah's behaviors are merely the normal behaviors of a two-year-old child and are not likely to be long-lasting.[3] This argument is entirely speculative and unsupported by any evidence presented at the hearing. Rather, the evidence showed that Josiah's behaviors were extreme for a child of his age and were serious enough to require Josiah to begin occupational therapy and behavior therapy treatments.

Respondent poses challenges to Findings of Fact 70 and 71, which included these determinations of the trial court:

> 70. Neither parent has taken the opportunity to learn about the special needs of the juvenile.

> 71. [Respondent] does not know the special needs of the juvenile. He blames DSS for any problems associated with the juvenile.

Respondent posits that it is unclear to what opportunities the trial court refers in Finding of Fact 70, because there was no evidence presented at the hearing regarding any opportunities for respondent to learn more about Josiah's special needs other than at the termination hearing itself. Respondent also claims that he was rightfully confused about what special needs Josiah has, because there is no definition of the term "special needs" in the North Carolina General Statutes; as a result, the meaning of this term is fluid and dependent upon the context in which it is used. Respondent

---

[3] Josiah was three years old at the time of the termination hearing.

further argues that there is no evidence that he blamed DSS for Josiah's special needs.

In making this argument, respondent ignores the thirteen Child and Family Team Meetings DSS held or attempted to hold with him over the course of the case in an effort to discuss Josiah's needs. Respondent either failed to attend, refused to attend, or cancelled nine of these thirteen sessions. The uncontroverted evidence in this case establishes that Josiah has special needs. Respondent admitted that he did not know what those needs were and rejected the fact that Josiah had special needs, asserting that he thought special needs were "like autism or Downs Syndrome." He blamed Josiah's aggressive behavior on Josiah's placement in daycare while in DSS custody and, although he admitted Josiah would need therapy, he asserted that this need was due to Josiah being "bounced around everywhere" while in DSS custody. Respondent refused to take any ownership of his role in Josiah's placement with DSS. The evidence shows that respondent was given numerous opportunities over the duration of the matter to learn about Josiah's special needs, but respondent failed to do so and instead blamed Josiah's problems on DSS. Any confusion held by respondent about Josiah's special needs is the consequence of respondent's failure to engage in his case plan and is not the result of the lack of a statutory definition for the term "special needs" as applied to Josiah. Accordingly, we hold that Findings of Fact 70 and 71 are supported by clear, cogent, and convincing evidence.

Respondent lastly challenges Findings of Fact 44 and 69:

44. [Respondent] has stated he will not take any medications for any reason to assist him in managing mental health symptoms.

. . . .

69. The parents missed 90% of the meetings that have to do with the juvenile's special needs.

We agree with respondent's arguments concerning these referenced findings of fact. With regard to Finding of Fact 44, the social worker testified that over the course of respondent's participation in FCT, respondent was never prescribed medication to manage any mental health symptoms, thus rendering respondent's statement that he *would* refuse to take medications, if prescribed, to be irrelevant with respect to his progress on his case plan. With regard to Finding of Fact 69, as noted above, the uncontroverted evidence was that respondent missed or cancelled nine of thirteen meetings intended to address the juvenile's special needs—a rate of 70% rather than 90%. Consequently, we disregard Findings of Fact 44 and 69 in our analysis of the trial court's adjudicatory conclusions of law.

*Conclusion of the Existence of the Ground of Neglect*

This Court now addresses respondent's argument that the trial court erred in concluding that grounds exist to terminate his parental rights based on neglect. A trial court may terminate parental rights when it concludes that the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in pertinent part, as a juvenile

"whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare . . . ." N.C.G.S. § 7B-101(15) (2019).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent.

*In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). "When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019) (citing *Ballard*, 311 N.C. at 715, 319 S.E.2d at 232). We agree that "[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.J.S.M.*, 257 N.C. App. 633, 637, 810 S.E.2d 370, 373 (2018) (citing *In re D.M.W.*, 173 N.C. App. 679, 688–89, 619 S.E.2d 910, 917 (2005)).

By orders entered 7 July 2017, the trial court adjudicated Josiah to be a neglected juvenile and established a case plan for respondent. In its termination order, the trial court made numerous findings which demonstrated respondent's lack of progress and concluded that there was a reasonable likelihood that the neglect would reoccur if Josiah were returned to respondent's care. As discussed in part

above, the trial court found: (1) respondent engaged in Family Centered Treatment, which is traditionally a nine- to twelve-month program, from August 2016 to August 2018, and completed only two of the four phases of the program, struggled with ownership of past trauma and experiences, never followed through with the requirements to progress in the program, and was discharged due to his inability to complete his goals; (2) after the commencement of the termination proceeding, respondent enrolled in a parenting program that was not sanctioned by DSS, attended four classes, and failed to complete the program; (3) respondent completed a Comprehensive Clinical Assessment on 10 January 2018 that recommended two different avenues by which he could responsibly address his substance abuse issues, but respondent prolonged his engagement of substance abuse services due in part to his willful delay in reinstating his Medicaid insurance coverage; (4) respondent completed a basic level substance abuse course in December 2018 but it did not include group or individual counseling, which had been recommended when he was discharged from the FCT program; (5) respondent informed the social worker that he would never really stop smoking marijuana, respondent was arrested for possession of marijuana and methamphetamine on 2 December 2017, respondent was convicted of said charges on 10 May 2018, and respondent was incarcerated for these convictions until 9 July 2018; (6) DSS requested that respondent submit to twenty-three drug screens, of which eight were positive for marijuana—including one taken the day after he was released from incarceration—eight of which were negative, and

seven to which respondent refused to submit; (7) respondent struggled with recurrent anger issues and his main reaction to conflict, or situations that angered or frustrated him, was to remove himself from the situation, leaving in an enraged state and not addressing the issue that made him angry; (8) although respondent lived in the same home since September 2017, he was late with rent several months, he received several disconnect notices from the utility company, and he was not able to have gas connected to the residence as the home's source for heat, thus leading to respondent's use of a space heater that inadequately heated the home; (9) respondent did not enroll in a formal budgeting program as ordered, even though he was referred to three different programs; (10) respondent attended only one appointment with Foothills Credit Counseling on 10 April 2018, with said appointment revealing that respondent's budget operated with a monthly deficit, that respondent's budget did not include the cost of having Josiah or Josiah's half-sibling in the home, that respondent's expenses had increased since the analysis of his budget, and that respondent's financial situation continued to be extremely tenuous; (11) respondent did not know the details of Josiah's special needs and failed or refused to attend eight of thirteen Child and Family Team Meetings to discuss Josiah's needs; (12) respondent continued to deny the reasons for DSS's custody of Josiah through 22 January 2019, blamed DSS for Josiah's issues, and blamed others for respondent's failure to complete components of his court-ordered case plan; and (13) respondent did not take responsibility for the reasons for Josiah's custody with DSS, and

respondent's progress over the course of two years to resolve the issues which led to Josiah's custody with DSS was not sufficient for the trial court to have found that Josiah would receive proper care and supervision from respondent during an unsupervised visit or trial home placement.

Although respondent made some progress toward completing his court-ordered case plan, his success was extremely limited and insufficient in light of Josiah's placement in DSS custody for over two years. We agree with the trial court that its findings demonstrate that there is a likelihood of repetition of neglect in the event that Josiah is returned to respondent's care and custody. This Court therefore affirms the trial court's adjudication on the ground of neglect to terminate respondent's parental rights.[4]

Due to our conclusion that the trial court did not err in adjudicating the ground of neglect, we need not address respondent's arguments regarding the ground of

---

[4] We note that respondent also expressly argues that the trial court's findings regarding respondent's tenuous financial situation are insufficient to support a finding of the likelihood of repetition of neglect. In support of his argument, respondent cites *In re Nesbitt*, 147 N.C. App. 349, 555 S.E.2d 659 (2001), in which the Court of Appeals concluded that a parent's inability to "mak[e] ends meet from month to month" is not "a legitimate basis upon which to terminate parental rights" on the ground of failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2). *Id.* at 358–59, 555 S.E.2d at 665–66. *Nesbitt*, however, is inapposite here, because, while N.C.G.S. § 7B-1111(a)(2) states in part that "[n]o parental rights . . . shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty," *id.*, the ground of neglect does not have a similar prohibition, *see* N.C.G.S. § 7B-101(15), -1111(a)(1). Moreover, the trial court did not premise its finding of neglect solely on respondent's tenuous financial situation, which is only one of several factors supporting the trial court's conclusion that there is a likelihood of repetition of neglect should Josiah be returned to respondent's care and custody.

failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2). *See In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019).

*Best Interests Determination*

Respondent argues that the trial court abused its discretion in concluding that it was in Josiah's best interests to terminate respondent's parental rights. We disagree with respondent's contention.

Once a trial court has adjudicated that grounds exist to terminate parental rights, it proceeds to the dispositional stage of a termination of parental rights hearing. N.C.G.S. § 7B-1110 (2019). At disposition, a trial court must consider the following factors and make findings as to any of them which it deems relevant:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

*Id.* A trial court's determination of whether termination of parental rights is in a juvenile's best interests "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6, 832 S.E.2d 698, 700 (2019) (citing *In re D.L.W.*, 368 N.C. 835, 842, 788

S.E.2d 162, 167 (2016)). This high standard of review requires a showing that "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015).

In the present case, the trial court made the following findings of fact in support of its conclusion that termination of respondent's parental rights was in Josiah's best interests:

> 1.  The juvenile is three years of age.
>
> 2.  There is a high likelihood that the juvenile will be adopted. The juvenile was placed in a pre-adoptive home on January 18, 2019.
>
> 3.  This [c]ourt has previously adopted a permanency plan for this juvenile of adoption, and termination of the parental rights as ordered herein will aid in the accomplishment of this plan.
>
> 4.  As to the bond between the juvenile and [his parents,] the [c]ourt finds as follows: There is a bond between the juvenile and his parents. However, the parents have not raised the juvenile since he was six months of age. The parents do not know his special needs, much less how to appropriately address those needs.
>
> 5.  As to the relationship between the juvenile and the prospective adoptive parents, the [c]ourt finds as follows: [T]he juvenile refers to the prospective adoptive parents as Mom and Dad. He consistently relies on them to meet his basic needs, goes to them for comfort and has a secure attachment to them. The prospective adoptive parents ensure that the juvenile attends occupational therapy and behavioral therapy.

6. The juvenile is in the same pre-adoptive home as his half-brother.

Respondent only challenges the trial court's findings that there is a "high likelihood" that Josiah will be adopted and that he was "placed in a pre-adoptive home on January 18, 2019." Respondent represents that the evidence only established that Josiah's placement was in a "*potential* pre-adoptive" home, and not a "pre-adoptive" home. This argument rests upon a distinction without a difference, as all pre-adoptive homes are by their nature inherently potential. The social worker testified that Josiah's current placement providers had expressed an interest in adopting Josiah and his half-sibling, that the home of these providers was considered a "therapeutic home" for Josiah's half-sibling, that the providers were participating in the half-sibling's therapy appointments, and that the providers were taking Josiah to his own appointments. Additionally, although Josiah had been placed with his current placement providers for less than three months, he was already referring to them as "Mom" and "Dad." This evidence supports the trial court's findings that Josiah had been placed in a pre-adoptive home, and that there was a high likelihood of Josiah's adoption.

Respondent further argues that the trial court abused its discretion in concluding that termination of parental rights is in Josiah's best interests in light of respondent's strong bond with Josiah, Josiah's loving and affectionate relationship with his paternal grandmother, the period of less than three months that Josiah had

been in the pre-adoptive home, and the FCT clinician's opinion that, given more time, respondent potentially could have completed all of the steps of the clinical process. While we recognize that the record in this case contains some evidence and the trial court's order contains some findings of fact that support respondent's position, nonetheless it is the province of the trial court to weigh the relevant factors in determining Josiah's best interests. *See In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 66 (2019). The trial court's findings show a reasoned conclusion which was not reached arbitrarily. Accordingly, we hold that the trial court did not abuse its discretion in determining that termination of respondent's parental rights is in Josiah's best interests. Therefore, we affirm the trial court's order.

AFFIRMED.